# 23-6822

*To Be Argued By*:
JANE KIM

# United States Court of Appeals

## FOR THE SECOND CIRCUIT
## Docket No. 23-6822

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

ROBERT HADDEN, AKA Sealed Defendant 1,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR THE UNITED STATES OF AMERICA

DAMIAN WILLIAMS,
*United States Attorney for the
Southern District of New York,
Attorney for the United States
of America.*
26 Federal Plaza, 37th Floor
New York, New York 10278
(212) 637-2200

JANE KIM,
PAUL M. MONTELEONI,
LARA POMERANTZ,
DANIELLE R. SASSOON,
  *Assistant United States Attorneys,
  Of Counsel.*

# TABLE OF CONTENTS

PAGE

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . .  1

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . .  2

    A.  The Government's Case . . . . . . . . . . . . . . .  2

    B.  The Defense Case . . . . . . . . . . . . . . . . . . . .  8

    C.  The Guilty Verdict and Sentence . . . . . . . . .  9

ARGUMENT:

POINT I—The District Court Properly Instructed
the Jury . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

    A.  Relevant Facts . . . . . . . . . . . . . . . . . . . . . .  10

    B.  Applicable Law . . . . . . . . . . . . . . . . . . . . . .  12

    C.  Discussion . . . . . . . . . . . . . . . . . . . . . . . . .  13

POINT II—The District Court's Evidentiary Rulings
Were Correct . . . . . . . . . . . . . . . . . . . . . . . . . . .  16

    A.  Standard of Review of Evidentiary
Rulings . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16

    B.  The District Court Properly Admitted
Evidence of Hadden's Other Sexual Assaults
Under Federal Rule of Evidence 413 . . . . .  17

        1.  Relevant Facts . . . . . . . . . . . . . . . . . . .  17

        2.  Rule 413 . . . . . . . . . . . . . . . . . . . . . . . .  19

        3.  Discussion . . . . . . . . . . . . . . . . . . . . . . .  20

ii

PAGE

C. Limited Testimony About the Impact of
   Hadden's Abuse Was Properly Admitted .  26

   1. Relevant Facts . . . . . . . . . . . . . . . . . . .  26

   2. Discussion. . . . . . . . . . . . . . . . . . . . . .  28

D. Evidence of Reporting Hadden's Assaults
   Was Properly Admitted . . . . . . . . . . . . . .  32

E. The District Court Did Not Improperly
   Admit Expert Testimony About Delayed
   Disclosure . . . . . . . . . . . . . . . . . . . . . . . . .  35

F. Any Errors Were Harmless . . . . . . . . . . .  37

POINT III—The District Court's Sentence Was
Procedurally Reasonable. . . . . . . . . . . . . . . . . .  39

A. Relevant Facts . . . . . . . . . . . . . . . . . . . . .  40

   1. The Parties' Sentencing
      Submissions . . . . . . . . . . . . . . . . . . . . .  40

   2. The Three-Day Sentencing . . . . . . . . .  41

B. Procedural Reasonableness . . . . . . . . . . . .  45

C. The Sentencing Proceeding Complied with
   Federal Rule of Criminal Procedure 32. . .  46

   1. Rule 32 . . . . . . . . . . . . . . . . . . . . . . . . .  46

   2. Discussion. . . . . . . . . . . . . . . . . . . . . . .  46

iii

PAGE

D.  The District Court Correctly Calculated the
    Guidelines Range . . . . . . . . . . . . . . . . . . . . .   49

    1.  The District Court Properly Considered
        Hadden's Uncharged Sexual Abuse of
        Female Patients as Relevant
        Conduct. . . . . . . . . . . . . . . . . . . . . . . . .   49

        a.  Relevant Conduct . . . . . . . . . . . . .   49

        b.  Discussion . . . . . . . . . . . . . . . . . .   50

    2.  The Guidelines Enhancement for a
        Large Number of Vulnerable Victims
        Applied . . . . . . . . . . . . . . . . . . . . . . . .   52

        a.  Vulnerable Victims
            Enhancement . . . . . . . . . . . . . . . .   52

        b.  Discussion . . . . . . . . . . . . . . . . . .   54

    3.  Any Error in the Guidelines Calculation
        was Harmless. . . . . . . . . . . . . . . . . . . . .   55

E.  The District Court Did Not Improperly
    Consider Victim Impact Statements . . . . .   56

F.  The District Court Properly Considered
    Hadden's Mitigation Arguments . . . . . . . .   57

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . .   60

iv

# TABLE OF AUTHORITIES

*Cases*:

*Anderson v. City of Bessemer City, N.C.*,
 470 U.S. 564 (1985). . . . . . . . . . . . . . . . . . . . . . . . 45

*Brown v. Keane*,
 355 F.3d 82 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . 34

*Neder v. United States*,
 527 U.S. 1 (1999). . . . . . . . . . . . . . . .   13, 16, 29, 36

*Norton v. Sam's Club*,
 145 F.3d 114 (2d Cir. 1998) . . . . . . . . . . . . . . . . . 14

*United States v. Ahders*,
 622 F.3d 115 (2d Cir. 2010) . . . . . . . . . .   50, 51, 52

*United States v. Bermudez*,
 529 F.3d 158 (2d Cir. 2008) . . . . . . . . . . . . . . . . . 32

*United States v. Brand*,
 467 F.3d 179 (2d Cir. 2006) . . . . . . . . . . . . . . . . . 23

*United States v. Broxmeyer*,
 616 F.3d 120 (2d Cir. 2010) . . . . . . . . . . . . . . 14, 15

*United States v. Broxmeyer*,
 699 F.3d 265 (2d Cir. 2012) . . . . . . . . . . . . . . 57, 59

*United States v. Carter*,
 960 F.3d 1007 (8th Cir. 2020) . . . . . . . . . . . . . . . 52

*United States v. Cavera*,
 550 F.3d 180 (2d Cir. 2008) (en banc) . . . . . . 45, 57

v

PAGE

*United States v. Certified Environmental Services, Inc.*,
753 F.3d 72 (2d Cir. 2014) . . . . . . . . . . . . . . . . . . 21

*United States v. Cline*,
986 F.3d 873 (5th Cir. 2021) . . . . . . . . . . . . . . . 55

*United States v. Cramer*,
777 F.3d 597 (2d Cir. 2015) . . . . . . . . . . . . . . . . 50

*United States v. Curley*,
639 F.3d 50 (2d Cir. 2011) . . . . . . . . . . . . . . . . . 32

*United States v. Davis*,
624 F.3d 508 (2d Cir. 2010) . . . . . . . . . . . . . . 20, 25

*United States v. DeMizio*,
741 F.3d 373 (2d Cir. 2014) . . . . . . . . . . . . . . . . 12

*United States v. Enjady*,
134 F.3d 1427 (10th Cir. 1998) . . . . . . . . . . . 19, 20

*United States v. Fareri*,
712 F.3d 593 (D.C. Cir. 2013). . . . . . . . . . . . . . . 55

*United States v. Feliciano*,
223 F.3d 102 (2d Cir. 2000) . . . . . . . . . . . . . . . . 12

*United States v. Gabinskaya*,
829 F.3d 127 (2d Cir. 2016) . . . . . . . . . . . . . . . . 12

*United States v. Gaskin*,
364 F.3d 438 (2d Cir. 2004) . . . . . . . . . . . . . . . . 54

*United States v. Gates*,
84 F.4th 496 (2d Cir. 2023) . . . . . . . . . . . . . 46, 48

vi

PAGE

*United States v. Gonzalez,*
    529 F.3d 94 (2d Cir. 2008) . . . . . . . . . . . . . . . . . 47

*United States v. Halvon,*
    26 F.4th 566 (2d Cir. 2022) . . . . . . . . . . . . . . . . . 58

*United States v. Hendricks,*
    921 F.3d 320 (2d Cir. 2019) . . . . . . . . . . 27, 30, 31

*United States v. Holland,*
    381 F.3d 80 (2d Cir. 2004) . . . . . . . . . . . . . . . . . 14

*United States v. Iodice,*
    525 F.3d 179 (2d Cir. 2008) . . . . . . . . . . . . . . . . . 17

*United States v. James,*
    139 F.3d 709 (9th Cir. 1998) . . . . . . . . . . . . . . . . 55

*United States v. Johnson,*
    860 F.3d 1133 (8th Cir. 2017) . . . . . . . . . . . . . . . 37

*United States v. Jones,*
    16 F.3d 487 (2d Cir. 1994) . . . . . . . . . . . . . . . . . . 32

*United States v. Jones,*
    460 F.3d 191 (2d Cir. 2006) . . . . . . . . . . . . . . . . . 57

*United States v. Kaufman,*
    546 F.3d 1242 (10th Cir. 2008) . . . . . . . . . . . . . . 54

*United States v. Lainez-Leiva,*
    129 F.3d 89 (2d Cir. 1997) . . . . . . . . . . . . . . . . . . 58

*United States v. Lajeunesse,*
    85 F.4th 679 (2d Cir. 2023) . . . . . . . . . . . . . . . . . 48

*United States v. Larson,*
    112 F.3d 600 (2d Cir. 1997) . . . . . . . . . . . . . . 20, 25

vii

PAGE

*United States v. Laverne,*
    963 F.2d 235 (9th Cir.1992) . . . . . . . . . . . . . . . . 48

*United States v. Livoti,*
    196 F.3d 322 (2d Cir. 1999) . . . . . . . . . . . . . . . . 20

*United States v. Margiotti,*
    85 F.3d 100 (2d Cir. 1996) . . . . . . . . . . . . . . . . . 48

*United States v. McCall,*
    174 F.3d 47 (2d Cir. 1998) . . . . . . . . . . . . . . . 53, 54

*United States v. McIntosh,*
    753 F.3d 388 (2d Cir. 2014) . . . . . . . . . . . . . . . . . 45

*United States v. McPartland,*
    81 F.4th 101 (2d Cir. 2023) . . . . . . . . . . . . . 25, 39

*United States v. Naiman,*
    211 F.3d 40 (2d Cir. 2000) . . . . . . . . . . . . . . . . . 12

*United States v. O'Neil,*
    118 F.3d 65 (2d Cir. 1997) . . . . . . . . . . . . . . . . . 53

*United States v. Oluwanisola,*
    605 F.3d 124 (2d Cir. 2010) . . . . . . . . . . . . . . . . 17

*United States v. Osorio,*
    17 F. App'x 52 (2d Cir. 2001) . . . . . . . . . . . . . . . 58

*United States v. Quinones,*
    511 F.3d 289 (2d Cir. 2007) . . . . . . . . . . . . . . . . 17

*United States v. Ramirez,*
    609 F.3d 495 (2d Cir. 2010) . . . . . . . . . . . . . . . . 39

*United States v. Randy Never Misses a Shot,*
    781 F.3d 1017 (8th Cir. 2015) . . . . . . . . . . . . . . . 25

viii

PAGE

*United States v. Rasheed*,
    981 F.3d 187 (2d Cir. 2020) . . . . . . . . . . . . . 45, 56

*United States v. Rosa*,
    957 F.3d 113 (2d Cir. 2020) . . . . . . . . . . . . . . . . 58

*United States v. Roy*,
    783 F.3d 418 (2d Cir. 2015) . . . . . . . . . . . . . . . . 12

*United States v. Rubenstein*,
    403 F.3d 93 (2d Cir. 2005) . . . . . . . . . . . . . . . . . 45

*United States v. Schaffer*,
    851 F.3d 166 (2d Cir. 2017) . . . . . . . . . . . . *passim*

*United States v. Siddiqui*,
    699 F.3d 690 (2d Cir. 2012) . . . . . . . . . . . . . . . . 17

*United States v. Tocco*,
    135 F.3d 116 (2d Cir. 1998) . . . . . . . . . . . . . . . . 34

*United States v. Valdez*,
    16 F.3d 1324 (2d Cir. 1994) . . . . . . . . . . . . . . . . 16

*United States v. Vargas-Cordon*,
    733 F.3d 366 (2d Cir. 2013) . . . . . . . . . . . . . . . . 13

*United States v. Verkhoglyad*,
    516 F.3d 122 (2d Cir. 2008) . . . . . . . . . . . . . . . . 58

*United States v. Vickers*,
    708 F. App'x 732 (2d Cir. 2017) . . . . . . . . . . . 21, 23

*United States v. Weintraub*,
    273 F.3d 139 (2d Cir. 2001) . . . . . . . . . . . . . 12, 15

*United States v. Wernick*,
    691 F.3d 108 (2d Cir. 2012) . . . . . . . . . . 50, 51, 52

ix

PAGE

*United States v. Whitten*,
  610 F.3d 168 (2d Cir. 2010) . . . . . . . . . . . . . . . . . 29

*United States v. Williams*,
  547 F. App'x 251 (4th Cir. 2013) . . . . . . . . . . . . 53

*United States v. Williams*,
  585 F.3d 703 (2d Cir. 2009) . . . . . . . . . . . . . . . . 32

*Statutes, Rules & Other Authorities*:

18 U.S.C. § 2422(a) . . . . . . . . . . . . . . . . . . . . . . . . 10, 14

18 U.S.C. § 2423(a) . . . . . . . . . . . . . . . . . . . . . . . . . 14

U.S.C. § 3553(a)(2)(A) . . . . . . . . . . . . . . . . . . . . . 43

Fed. R. Crim. P. 32 . . . . . . . . . . . . . . . . . . . . . . . . 46

Fed. R. Crim. P. 52(a) . . . . . . . . . . . . . . . . . . . . . . 12

Fed. R. Evid. 401(a) . . . . . . . . . . . . . . . . . . . . . . . 21

Fed. R. Evid. 403 . . . . . . . . . . . . . . . . . . . . . . . . . 20

Fed. R. Evid. 413(a) . . . . . . . . . . . . . . . . . . . . . 19, 21

Fed. R. Evid. 413(d) . . . . . . . . . . . . . . . . . . . . . . . 19

Fed. R. Evid. 803(4) . . . . . . . . . . . . . . . . . . . . . . . 33

Fed. R. Evid. 803(2) . . . . . . . . . . . . . . . . . . . . . 33, 34

U.S.S.G. § 1B1.3 . . . . . . . . . . . . . . . . . . . . . . . . . . 49

U.S.S.G. § 1B1.3(a)(1)(A) . . . . . . . . . . . . . . . . . . 50, 51

U.S.S.G. § 1B1.3(a)(2) . . . . . . . . . . . . . . . . . . . . . . 50

x

PAGE

U.S.S.G. § 1B1.3(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . 50

U.S.S.G. § 3A1.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

U.S.S.G. § 3A1.1(b)(1) . . . . . . . . . . . . . . . . . . . . . 52, 54

U.S.S.G. § 3A1.1(b)(2) . . . . . . . . . . . . . . . . . . . . . 53, 54

# United States Court of Appeals

## FOR THE SECOND CIRCUIT
## Docket No. 23-6822

―――――――

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

ROBERT HADDEN, also known as Sealed Defendant 1,

*Defendant-Appellant.*

―――――――

## BRIEF FOR THE UNITED STATES OF AMERICA

―――――――

### Preliminary Statement

Robert Hadden appeals from a judgment of conviction entered on July 25, 2023, in the United States District Court for the Southern District of New York, following a ten-day jury trial before the Honorable Richard M. Berman, United States District Judge.

Superseding Indictment S2 20 Cr. 468 (RMB) (the "Indictment") was filed on June 1, 2022, in eight counts. Counts One through Eight each charged Hadden with enticement in violation of 18 U.S.C. §§ 2422 and 2, in connection with Hadden's inducement of female victims to travel interstate to engage in unlawful sexual activity.

2

Trial commenced on January 4, 2023, and ended on January 24, 2023, when Hadden was convicted of Counts Two, Five, Seven, and Eight, which were the only counts on which the Government proceeded to trial.

On July 25, 2023, the District Court sentenced Hadden principally to 20 years' imprisonment and lifetime supervised release.

Hadden is serving his sentence.

### Statement of Facts

### A.  The Government's Case

The evidence at trial proved that for over two decades, beginning in the late 1980s and continuing through 2012, Hadden sexually abused and assaulted dozens of female patients in his capacity as their obstetrician-gynecologist ("OB/GYN") affiliated with Columbia University and NewYork-Presbyterian Hospital. Hadden leveraged his position of power as a doctor to deceive and sexually abuse patients seeking medical care.

The trial evidence included the testimony of nine women who were sexually abused and assaulted by Hadden during purported medical examinations, four of whom were statutory victims referenced in the Indictment; the testimony of two nursing staff who witnessed Hadden sexually assault victims in approximately the late 1980s and the 1990s; the testimony of two experts regarding the doctor-patient relationship and the standard of care for obstetrics and gynecology; a transcript of Hadden's February 23, 2016 state guilty

plea in New York Supreme Court to two offenses relating to his sexual assault of two patients; medical records; Hadden's personnel records; and phone records, text messages, and emails that corroborated the victims.

Hadden's abuse and assault of victims included touching their breasts and vaginas, digitally penetrating their genitals, and licking their vaginas during purported medical examinations and without any valid medical purpose. (*See, e.g.*, A. 535, 560, 622-23, 641-42, 645, 657, 663, 673, 709-12, 777, 782).[1] Hadden massaged, squeezed, and cupped victims' breasts for several minutes during purported exams, and pulled and twisted their nipples. (*See, e.g.*, A. 623, 631, 644, 657, 709-10, 775). Hadden attempted to masturbate victims, including by rubbing their clitorises and vaginas, and penetrating their vaginas with his fingers. (*See, e.g.*, A. 532-33, 621-22, 631, 709-12, 777). Hadden licked several victims' vaginas. (A. 535, 560, 622, 641-42, 645, 663, 673, 711-12, 777, 782). Expert medical testimony about the standard of care, best practices,

---

[1]  "Br." refers to Hadden's brief on appeal; "A." refers to the appendix filed with that brief; "PSR" or "Presentence Report" refers to the Presentence Investigation Report prepared by the United States Probation Office ("Probation Office") in connection with Hadden's sentencing; "GX" refers to a Government exhibit at trial; and "Dkt." refers to a District Court docket entry in this case. Unless otherwise noted, case citations omit all internal quotation marks, citations, alterations, and footnotes.

4

and physician's professional obligations, established that this abuse lacked any valid medical purpose. (*See* A. 570, 574-75, 577).

To abuse patients undetected, Hadden used certain methods that he honed over his medical career. Hadden exploited his patients' trust and the power differential inherent in the doctor-patient relationship. (A. 695-97). Hadden attempted to develop trust and rapport with victims by asking questions about their personal lives and telling them about his own life and family. (*See, e.g.*, A. 530, 655, 726). Hadden asked victims invasive and medically unnecessary questions and provided unsolicited commentary about their appearance and sexual practices (including regarding sex toys, achieving orgasm, and pornography). (*See, e.g.*, A. 531-32, 558-59, 655-56, 776, 781). Hadden created opportunities to be alone with patients so he could abuse them, including by finding ways to get nurses and assistants out of the examination room, and by telling patients that he needed to reexamine them after the nurse had left the room. (*See, e.g.*, A. 532-35, 560, 632, 641-42, 777). These techniques, which Hadden refined over time, made it difficult for victims to recognize Hadden's abuse (A. 693-96), and allowed Hadden to continue to sexually abuse victims unchecked and under the guise of medical care (A. 699).

At trial, the Government proved that Hadden induced the four statutory victims (Emily Anderson, Sara Stein, Melissa Taylor, and Kate Evans) to travel interstate so that he could sexually abuse and assault them, and this this inducement was premeditated.

5

*Sara Stein*. From approximately 1998 to 2010, Hadden sexually abused and assaulted Sara, including during her two pregnancies. (A. 705, 708-10). When Sara first became Hadden's patient, she had minimal experience with OB/GYNs and gynecological exams, and Hadden was her first regular OB/GYN. (A. 705). Sara grew up in a highly religious household in which sex and the female body were rarely discussed. (A. 706). At every appointment when she was pregnant and almost every appointment when she was not pregnant, Hadden sexually abused Sara by massaging and groping her breasts and pulling her nipples without any medical reason. (A. 709-10). At nearly every appointment, Hadden sexually assaulted Sara by rubbing her labia and clitoris without any medical reason and during purported vaginal exams. (A. 709-11). At the end of each appointment, after having sexually abused and assaulted her, Hadden told Sara when to return. (A. 709). Sara trusted Hadden as her doctor and traveled interstate from New Jersey to New York for appointments with Hadden. (A. 706-09; GX 902, 903). At her last appointment on November 9, 2010, Hadden rubbed Sara's clitoris and licked her vagina. (A. 711-12; GX 801B).

*Emily Anderson*. From approximately 1999 to 2012, Hadden sexually abused and assaulted Emily. (A. 654, 657, 672-73, 675). Hadden was Emily's first gynecologist. (A. 654). Hadden gained Emily's trust by, among other things, frequent electronic and phone communications with her, and treating her through significant medical issues. (A. 655). In 2005, Emily moved to Nevada and trusted Hadden so much that she traveled cross-country to Manhattan for

6

appointments with him. (A. 656). Over thirteen years, at every appointment, Hadden sexually abused Emily by fondling and massaging her breasts and pulling her nipples. (A. 657-58). He provided unsolicited thoughts about sex positions that would enable Emily to achieve orgasm. (A. 655-56).

In February 2012, Hadden conducted surgery on Emily, removing several of her fibroids. (A. 663, 673). At Hadden's direction, Emily flew interstate for fibroid surgery and a follow-up appointment solely for the purpose of receiving medical care from Hadden. (A. 663). In March 2012, at the follow-up appointment, Hadden licked Emily's vagina during a purported vaginal examination. (A. 663, 673).

*Melissa Taylor*. From approximately April 2008 to January 2009, Hadden repeatedly sexually abused and assaulted Melissa. (A. 617-18, 620). Hadden knew that Melissa specifically sought his care because she previously had a terrible experience delivering her first child in a small hospital, causing the child medical issues. (A. 618). Hadden gained Melissa's trust by talking to her about her personal life, her traumatic first delivery, and her first child's developmental delays. (A. 618). Melissa trusted Hadden so much that she drove approximately four hours roundtrip from Pennsylvania to Manhattan for appointments with Hadden. (A. 618). At the end of each appointment, Hadden told Melissa when to return. (A. 620).

Hadden sexually abused Melissa by, among other things, repeatedly touching her breasts without any medical reason while she was pregnant. (A. 622-24). During one particular appointment late in Melissa's

7

pregnancy, Hadden attempted to masturbate Melissa
during a purported vaginal examination, moving his
fingers in and out of her vagina and causing pain.
(A. 621-22). When Melissa became tense, Hadden
falsely stated he was trying to feel the baby's head.
(A. 622). Hadden then licked Melissa's clitoris.
(A. 622). While Hadden's head was between her legs,
he asked Melissa if her husband "ate [her] out" and
said her husband should "eat [her] out" because it was
"good for the baby." (A. 622). Hadden then positioned
himself between her legs, rubbing his erect penis
against her. (A. 623). He then massaged both of
Melissa's breasts at the same time and pulled on her
nipples until they were hard. (A. 623).

   In 2009, after Melissa delivered her child, she re-
turned for another appointment at Hadden's direction,
during which Hadden groped Melissa's breasts and
nipples and directed Melissa, who was naked, to bend
over in front of him and touch her toes. (A. 623-24).

   *Kate Evans*. Hadden was Kate's longtime gynecol-
ogist, from approximately the late 1990s to 2011.
(A. 528-29, 533-34). Hadden gained Kate's trust over
time, including by talking with her about her children
and family life. (A. 530). Hadden assaulted Kate twice.
In November 2010, after completing breast and vagi-
nal exams, the nurse left the examination room, and
Hadden moved to the door as if leaving too. (A. 532).
Hadden whispered to Kate, "One minute. Stay there."
(A. 532). Hadden then left the exam room, while Kate
remained on the examination table, concerned that
she had a medical issue. (A. 532-33). Hadden returned
alone and pretended to conduct a second vaginal exam.

8

(A. 533). Gloveless, Hadden sexually assaulted Kate by erratically touching her vaginal area, including her clitoris, and digitally penetrating her vagina. (A. 533).

After sexually assaulting Kate, Hadden directed her to return the following year. (A. 533-34). The next year, in November 2011, Hadden sexually assaulted Kate again. (A. 534). After the nurse left the room following a breast and vaginal exam, Hadden moved towards the door and whispered, "Just one minute." (A. 534). He left the room and returned alone. (A. 534-35). While purporting to perform a second vaginal examination, Hadden licked Kate's vagina. (A. 535). For both of these appointments, Kate traveled from New Jersey to New York. (A. 529-30).

In addition to testimony from the statutory victims, five of Hadden's other patients testified about being assaulted by him during medical visits. The assaults including improper breast exams, touching his patients' vaginas, and licking his patients' vaginas. (A. 558-60, 631-33, 634-48, 773-82).

## B.  The Defense Case

Hadden called one witness: a Columbia employee who worked as a medical secretary. (A. 996-1001). Through cross-examination and closing argument, Hadden did not contest that *some acts* he committed constituted sexual abuse (*i.e.*, licking a vagina has no valid medical purpose), but he asserted that some of his alleged sexual abuse and impropriety was within the standard of care (*e.g.*, raising sexualized topics with patients, massaging breasts for prolonged periods, pulling nipples, touching and rubbing patient

9

vaginas and clitorises, and digitally penetrating pa-
tient vaginas) (*e.g.*, A. 582, 604-08, 612-15, 704; Dkt.
228). In addition, Hadden argued that his sex crimes
were spontaneous and that he did not intend to sex-
ually abuse the statutory victims when he induced
them to travel interstate. (A. 552, 1028).

## C. The Guilty Verdict and Sentence

On January 24, 2023, the jury convicted Hadden of
the four counts on which the Government proceeded to
trial. (A. 42).

On July 25, 2023, Judge Berman sentenced Had-
den to 20 years' imprisonment on each count of convic-
tion, to run concurrently, and to be followed by lifetime
supervised release. Judge Berman imposed a $10,000
fine and a $400 mandatory special assessment.

## A R G U M E N T

### POINT I
### The District Court Properly Instructed the Jury

Hadden claims that the District Court erred by re-
fusing to charge the jury that a defendant must pos-
sess the intent to engage in unlawful sexual activity at
the time of inducement. (Br. 38). This argument is
meritless. The charging language requested by Had-
den, and omitted by the District Court, was superflu-
ous in light of the charge as a whole, which conveyed
that to convict Hadden, the jury had to find that Had-
den had unlawful intent at the time of inducement.

10

## A.  Relevant Facts

Hadden was charged with multiple counts of enticement under 18 U.S.C. § 2422(a), which prescribes a sentence of up to 20 years imprisonment for "[w]hoever knowingly persuades, induces, entices or coerces any individual to travel in interstate or foreign commerce . . . to engage in . . . any sexual activity for which any person can be charged with a criminal offense." 18 U.S.C. § 2422(a).

Prior to trial, Hadden asked that the jury be instructed that the Government must establish that the defendant's intent for the individual to engage in sexual activity "existed at the time of the inducement, persuasion, enticement or coercion." (Dkt. 195-2 at 30). The Government argued that Hadden's proposed language was unnecessary given the proposed instruction that the Government must prove that "a motivating or significant purpose" of inducing the victims to travel interstate was to engage in unlawful sexual activity. (Dkt. 195-2 at 30-31). The parties maintained their positions in subsequent filings (Dkt. 233-1 at 29-30), and at the charge conference (A. 975).

As to the element of intent, the District Court instructed the jury that the Government must prove "that the Defendant acted with the intent that the Victim named in a particular count would engage in sexual activity that is a crime under New York State law." (A. 1079). Judge Berman elaborated:

> It is not necessary for the government to prove that the unlawful sexual activity was the defendant's sole purpose for

11

> persuading, inducing, enticing, or coerc-
> ing the victims to travel across state
> lines. A person may have several differ-
> ent purposes or motives for such conduct,
> and each may prompt in varying degrees
> the victim's actions. *The government
> must prove beyond a reasonable doubt,
> however, that a motivating or significant
> purpose was that the victims travel across
> state lines to engage in unlawful sexual
> activity.* The unlawful sexual activity
> must not have been merely incidental to
> the trip. . . .

(A. 1079 (emphasis added)). The District Court ex-
plained that, "it is not a defense that the sexual activ-
ity which may have been intended by the Defendant
was not accomplished. . . . *It is enough if [the] Defend-
ant has the requisite intent at the time of the entice-
ment.*" (A. 1080 (emphasis added)). Judge Berman also
instructed the jury on the theory of the defense,
namely that Hadden "did not induce, entice, persuade
or coerce any of the four Victims . . . to cross state lines
for the purpose of sexually abusing them" and that
Hadden "did not have the intent to sexually abuse any
specific woman at the time he told them to come back
for their next medical appointment." (A. 1081).

Consistent with these instructions, the Govern-
ment argued in summation that Hadden's sexual
abuse was premeditated, pointing to evidence estab-
lishing Hadden's intent at the time of inducement.
(A. 1011-19). The defense argued that Hadden did not
have the requisite intent at the time of inducement

12

because his sex crimes were impulsive and opportunistic. (A. 1028).

## B. Applicable Law

An appellant challenging a jury instruction faces a "heavy burden." *United States v. Feliciano*, 223 F.3d 102, 116 (2d Cir. 2000). Where the defendant's claim is that the district court misled the jury by omitting an instruction that he requested, the defendant must demonstrate both that (1) he requested a charge that "accurately represented the law in every respect" and (2) the charge delivered, when viewed as a whole, was erroneous and prejudicial. *United States v. Roy*, 783 F.3d 418, 420 (2d Cir. 2015).

An "'instruction is erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law.'" *Id.* (quoting *United States v. Naiman*, 211 F.3d 40, 51 (2d Cir. 2000)). "As a general matter, no particular wording is required for a jury instruction to be legally sufficient, but rather, this Court must look to the charge as a whole to determine whether it adequately reflected the law and would have conveyed to a reasonable juror the relevant law." *United States v. Gabinskaya*, 829 F.3d 127, 132 (2d Cir. 2016); *see also United States v. Weintraub*, 273 F.3d 139, 151 (2d Cir. 2001) ("We do not review portions of the instructions in isolation, but rather consider them in their entirety to determine whether, on the whole, they provided the jury with an intelligible and accurate portrayal of the applicable law.").

Reversal is not warranted if the alleged error was harmless. Fed. R. Crim. P. 52(a); *see United States v.*

13

*DeMizio*, 741 F.3d 373, 384 (2d Cir. 2014). Thus, a conviction should be affirmed despite instructional error if it "appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Neder v. United States*, 527 U.S. 1, 15 (1999).

## C.  Discussion

The District Court properly instructed the jury on the elements of a Section 2422(a) offense, including with respect to intent. Hadden argues that the Government was required to prove that Hadden intended that the victim(s) engage in unlawful sexual activity "at the time of the inducement, persuasion, enticement or coercion." (Br. 41). But that is precisely what Judge Berman's jury instructions conveyed. By telling the jury that the government must prove "that a motivating or significant purpose" for inducing the victims to travel across state lines was "that the victims travel across state lines to engage in unlawful sexual activity," the District Court necessarily communicated that unlawful intent must exist at the time of the inducement. (A. 1079); *cf. United States v. Vargas-Cordon*, 733 F.3d 366, 375-76 (2d Cir. 2013) (with respect to 18 U.S.C. § 2423, explaining that the Government need only prove that intent to engage in unlawful sexual activity was "one of multiple dominant purposes" of transporting a minor). That instruction, as well as Judge Berman's directive that "[i]t is enough if the defendant has the requisite intent at the time of the persuasion, inducement, enticement, and coercion" (A. 1080), gives the lie to Hadden's claim that the intent instruction "had no nexus with inducement" (Br. 43).

14

Hadden also fails to identify any case that requires the inclusion of the exact language he proposed below. Hadden relies principally on *United States v. Brox-meyer*, 616 F.3d 120 (2d Cir. 2010) (Br. 39), but his preferred formulation does not appear there. *Broxmeyer* did not opine on proper jury instructions at all but concerned a sufficiency challenge to a conviction under 18 U.S.C. § 2423, the "plain wording" of which "requires that the *mens rea* of intent coincide with the *actus reus* of crossing state lines." 616 F.3d at 129.[2] Hadden emphasizes aspects of the record that he believes could have supported an acquittal, but he cannot show that his defense "theory [was] not effectively presented elsewhere in the charge." *United States v. Holland*, 381 F.3d 80, 84 (2d Cir. 2004). On the contrary, Judge Berman's instructions expressly delineated the theory of the defense (A. 1081).[3] Considered in their entirety,

---

[2]    *Compare* 18 U.S.C. § 2423(a) ("A person who knowingly transports an individual who has not attained the age of 18 years in interstate . . . commerce . . . with intent that the individual engage . . . in any sexual activity . . . .), with 18 U.S.C. § 2422(a) ("Whoever knowingly persuades . . . any individual to travel in interstate . . . commerce . . . to engage . . . in any sexual activity . . . .").

[3]    Hadden also claims that the "vague nature of the charge on inducement, and the parties' disagreement as to its legal meaning, made the requirement of contemporaneous criminal intent that much more important." (Br. 40). But Hadden does not properly challenge on appeal Judge Berman's inducement instruction, which was in any event correct. *See Norton v.*

15

the jury instructions accurately described the elements of the offense, even if the District Court did not adopt Hadden's precise proposal. *See Weintraub*, 273 F.3d at 141.

The record also demonstrates that even if the District Court erred—which it did not—any error was harmless. The "[a]mple evidence" that Hadden claims supported his defense (Br. 42-43) was presented to and rejected by the jury. In its summation, consistent with the jury instructions, and in response to Hadden's arguments that the Government must "show that at the time of the inducements, [Hadden's] intention was sexual assault" (A. 1028), the Government argued no fewer than nine reasons to conclude that Hadden "intended to abuse the victims when he got them to travel." (A. 1011). At no point did the Government suggest that the jury could convict Hadden absent proof beyond a reasonable doubt that he had the requisite intent to abuse his patients at the time he instructed them to return to New York. Given Hadden's ongoing and premeditated pattern of abuse, it "appears beyond a reasonable doubt that the error complained of did not

---

*Sam's Club*, 145 F.3d 114, 117 (2d Cir. 1998) ("Issues not sufficiently argued in the briefs are considered waived and normally will not be addressed on appeal."). The District Court correctly instructed the jury that the terms persuade, induce, entice, and coerce "have their plain and ordinary meanings." (A. 1079); *Broxmeyer*, 616 F.3d at 125 (explaining that these are "words of common usage that have plain and ordinary meanings").

16

contribute to the verdict obtained." *Neder*, 527 U.S. at 15.

## POINT II

### The District Court's Evidentiary Rulings Were Correct

On appeal, Hadden challenges several of the District Court's evidentiary rulings, claiming that they were "irrelevant, cumulative, bolstering, and highly prejudicial" because "the case was not about credibility and the defense conceded that the abuse occurred." (Br. 44). Hadden mischaracterizes the trial record. Although Hadden admitted that certain acts of abuse occurred, he contested the scope and scale of the abuse, called the victims' credibility and memory into question, and denied acting with the requisite intent, instead insisting that the limited abuse to which he admitted was spontaneous and unplanned. Under these circumstances, it was well within the District Court's discretion to admit evidence that corroborated and proved Hadden's abuse and intent, including evidence of other sexual assaults, limited testimony about the impact of Hadden's abuse, and evidence of the victims reporting Hadden's abuse.

### A.  Standard of Review of Evidentiary Rulings

This Court has long held that "[a] district court judge is in the best position to evaluate the admissibility of offered evidence." *United States v. Valdez*, 16 F.3d 1324, 1332 (2d Cir. 1994). Therefore, this Court "review[s] a trial court's evidentiary rulings deferentially," and "will reverse only for abuse of discretion,"

17

which requires a finding that the challenged ruling was "arbitrary and irrational." *United States v. Quinones*, 511 F.3d 289, 307-08 (2d Cir. 2007). In addition, this Court reviews supporting factual findings for clear error. *See United States v. Iodice*, 525 F.3d 179, 185 (2d Cir. 2008).

Even when a district court's evidentiary ruling is "manifestly erroneous," the defendant is not entitled to a new trial if the error was harmless. *United States v. Siddiqui*, 699 F.3d 690, 702 (2d Cir. 2012). "Under harmless error review, [this Court] ask[s] whether [it] can conclude with fair assurance that the errors did not substantially influence the jury." *United States v. Oluwanisola*, 605 F.3d 124, 133-34 (2d Cir. 2010).

## B. The District Court Properly Admitted Evidence of Hadden's Other Sexual Assaults Under Federal Rule of Evidence 413

Hadden argues that testimony about Hadden's assaults against additional female victims was cumulative and unduly prejudicial, and should have been excluded under Federal Rule of Evidence 403. (Br. 45-46). But the District Court properly admitted this evidence, which constituted other sexual assault evidence under Rule 413, and was relevant to establish Hadden's intent and to corroborate the other victim testimony.

### 1. Relevant Facts

In addition to the testimony of the four statutory victims, and over Hadden's objection, the Government introduced the testimony of five additional female

18

patients assaulted by Hadden during medical appoint-
ments and of two nurses who witnessed Hadden as-
sault female patients. (A. 558-60, 629-33, 634-648,
699-03, 769-77, 782). During trial, Hadden claimed
that his concession in opening statement that he had
committed certain acts of sexual abuse rendered this
evidence of other sexual assaults unnecessary.
(A. 554). The Government disagreed, highlighting that
Hadden was "only conceding certain acts of sexual
abuse, such as the licking of a victim's vagina and in
some cases digital masturbation," but was still disput-
ing that he performed unnecessary breast, rectal, and
vaginal exams. (A. 602; *see also* A. 602 (Hadden's coun-
sel explaining that he questioned a witness to elicit
that there is "a range of practices" when it comes to
gynecological exams)).

The Government also argued that the "pervasive-
ness of the defendant's sexual abuse" was probative of
intent and of Hadden's mental state when "enticing
victims to travel interstate," which was the central dis-
puted issue at trial (A. 601); throughout trial, Hadden
argued that his intent formed impulsively during ap-
pointments and tried to cast Hadden's abuse as infre-
quent, isolated, and spur-of-the-moment. (*See, e.g.*,
A. 552 (defense explaining theory to Court), 1028 (de-
fense summation)). Hadden acknowledged a strategy
of sowing "seeds of doubt" as to the Government's evi-
dence of certain acts of abuse. (A. 602 ("[I]t is our Con-
stitutional duty to plant seeds of doubt."), 603 ("The
government is right, the implication of that is at the
least that maybe she wasn't sure about the abuse.")).

19

Judge Berman denied Hadden's efforts to preclude the evidence of other sexual abuse. (A. 540, 552, 757).[4]

## 2. Rule 413

Under Rule 413, in a criminal case where the defendant is accused of a sexual assault, "evidence that the defendant committed any other sexual assault" is admissible and "may be considered on any matter to which it is relevant." Fed. R. Evid. 413(a); *see also* Fed. R. Evid. 413(d) (defining sexual assault). "In other words, a prosecutor may use evidence of prior sexual assaults to show that a defendant has a pattern or propensity for committing sexual assault." *United States v. Schaffer*, 851 F.3d 166, 178 (2d Cir. 2017). Rule 413 is based on the premise that "evidence of other sexual assaults is highly relevant to prove propensity to commit like crimes." *United States v. Enjady*, 134 F.3d 1427, 1431 (10th Cir. 1998) (citing the congressional record).

---

[4]    Ultimately, the Government significantly pared back its evidence of other sexual assaults, reducing the number of additional victims from 20 to five. (A. 115-25, 601, 777). The District Court precluded the testimony of a victim's spouse, and permitted the testimony of five victims of uncharged abuse, the romantic partner of one victim, and two nursing personnel who witnessed uncharged abuse. The District Court also admitted portions of Hadden's state guilty plea transcript related to acts of abuse against two of the victims of uncharged abuse. (A. 374).

20

Any evidence offered at trial must also satisfy Rule 403, which provides that the "probative value" must outweigh "the danger of unfair prejudice," among other things. Fed. R. Evid. 403. Evidence is not unduly prejudicial when it is not "more inflammatory than the charged crime[s]." *United States v. Livoti*, 196 F.3d 322, 326 (2d Cir. 1999). In enacting Rules 413 and 414, Congress "expected that convictions within [their] ambit would normally be admitted and that their prejudicial value would normally not be outweighed by the risk of prejudice." *United States v. Davis*, 624 F.3d 508, 512 (2d Cir. 2010) (citing *United States v. Larson*, 112 F.3d 600, 604-05 (2d Cir. 1997) (citing legislative history and affirming district court's admission of evidence of defendant's sexual assault of other victims)); *see also Schaffer*, 851 F.3d at 178 (quoting *Enjady*, 134 F.3d at 1431 and the Congressional record).

### 3. Discussion

Hadden cannot show that the District Court erred in admitting evidence of Hadden's other sexual assaults under Rule 413, which creates a presumption that evidence of prior sexual assaults is relevant and probative in prosecutions like this one that involved charges of sexual assault. *See Schaffer*, 851 F.3d at 180 ("the practical effect of Rule 413 is to create a presumption that evidence of prior sexual assaults is relevant and probative in a prosecution for sexual assault").

Hadden acknowledges that the evidence was "relevant to prove Mr. Hadden's pattern of conduct and intent to commit sexual abuse during the interstate inducement," but insists that the "charged victims

21

themselves were sufficient to prove these." (Br. 47).
But evidence of other sexual assaults "may be consid-
ered on any matter to which it is relevant," Fed. R.
Evid. 413(a), and under Rule 401, "[e]vidence is rele-
vant if . . . it has any tendency to make a fact more or
less probable than it would be without the evidence."
Fed. R. Evid. 401(a); *see also United States v. Certified
Environmental Services, Inc.*, 753 F.3d 72, 90 (2d Cir.
2014) (an "incremental effect . . . is sufficient" for evi-
dence to be relevant). Hadden effectively concedes, as
he must, that the evidence readily cleared this low bar
(Br. 47): evidence that Hadden assaulted other female
patients made it more likely that he had assaulted the
statutory victims and intended to sexually abuse them
when he induced them to travel interstate. *See Schaf-
fer*, 851 F.3d at 178 ("a prosecutor may use evidence of
prior sexual assaults to show that a defendant has a
pattern or propensity for committing sexual assault");
*see also United States v. Vickers*, 708 F. App'x 732, 736
(2d Cir. 2017) (same).[5]

_____

[5] Hadden appears to fault the Government for
"commingl[ing] the charged and uncharged witnesses'
accounts, treating them the same." (Br. 23). But the
Government distinguished the statutory victims from
the other victims in its summation and used the evi-
dence from non-statutory victims to show a pattern,
which at times involved discussing commonalities be-
tween the statutory and other victims (A. 1005-06;
1018 (describing Hadden's "pattern and practice");
1033-34 (describing premeditated nature of Hadden's

22

Hadden suggests that the probative value was minimal because the evidence was cumulative. (Br. 47-48). But while Hadden implies on appeal that evidence of Hadden's pattern of conduct was open and shut, below he maintained that any abuse was infrequent and impulsive. (A. 1028). Throughout trial, Hadden implied that certain conduct did not constitute sexual assault and was within the standard of care. Among other things, Hadden elicited expert testimony about breast and vaginal examinations and relied on a breast examination training video to suggest that Hadden's groping of the victims' breasts, pulling their nipples, and touching and rubbing of their vaginas was merely thorough examination. (A. 582, 604-08, 612-15; Dkt. 228). Hadden also suggested through cross examination that nurses who observed Hadden assaulting his victims were unreliable and must have misinterpreted his behavior. (A. 603, 703, 772). Hadden relied on this testimony in summation to argue that Hadden had no intent to abuse his victims at the time he induced them to travel interstate, and that his examinations were within the standard of care, despite victim testimony that Hadden had touched them sexually and nurses' testimony that they had witnessed Hadden sexually touching the vaginas of multiple women. (A. 1027-28; *Compare* Tr. 1069 ("now those may not be the breast exams that everyone is used to, but Dr. Eddleman told us they're within the standard of care, and Stanford University tells us that's the proper way to do a breast exam"), *with* A. 657 (Emily describing Hadden

_____

crimes)). That is a permissible use of Rule 413 evidence. *See Schaffer*, 851 F.3d at 178.

23

"massaging" her breasts), 710 (Sara, similar), 622-23 (Melissa, similar)).

Thus, evidence of Hadden's other acts of sexual assault established the pervasive and premeditated nature of his abusive conduct, the strikingly similar tactics he honed over the course of his career to carry out and conceal his abuse, and a pattern of predatory behavior that was probative of Hadden's intent to abuse at the time of inducement.[6] Absent this evidence, the defense may have successfully misled the jury to conclude that Hadden's sexual assaults (*i.e.*, oral sexual contact) of the statutory victims were isolated and sporadic, and that Hadden's intent to abuse arose spontaneously after the statutory victims traveled to see him. Far from being needlessly cumulative, the evidence was more highly probative precisely because the other assaults likewise involved the same behavior of abusing female patients during medical appointments. *See Schaffer*, 851 F.3d at 182 (affirming district court's holding that the defendant's "prior acts demonstrating his sexual interest in minor females are extremely relevant to the question of his intent here"); *Vickers*, 708 F. App'x at 736 (evidence "was plainly admissible under Rule 413 and 414 because it was probative of [the defendant's] propensity for sexually abusing adolescent boys who were entrusted in his care.").

_____

[6] For these reasons, the evidence was also properly admitted as probative of Hadden's intent and a common scheme or plan under Federal Rule of Evidence 404(b). *See United States v. Brand*, 467 F.3d 179, 196 (2d Cir. 2006).

24

The evidence was also probative of witness credibility. Despite Hadden's assertion on appeal that the "victim-credibility rationale for admission evaporated" (Br. 47), Hadden sought to undermine victim credibility at trial. In addition to seeking to discredit witness testimony that Hadden's supposed "exams" were sexual in nature, Hadden highlighted in opening statement and cross examination the financial incentives of the victims who had participated in civil lawsuits against Columbia University and Hadden. (A. 444, 525, 717-19; *see also* 555-62 (telling Government counsel that the defense would cross-examine victims about participation in a civil lawsuit against Hadden if the Government did not elicit it first)). Contrary to Hadden's claim that he did not "ask questions suggesting that anyone" had "delayed disclosure" (Br. 10), Hadden questioned two victims about their decisions to return for further treatment after purported abuse. (A. 625-27, 676-77; DXs HH, II).[7] Hadden also questioned Emily, a statutory victim, about the accuracy of her memory (A. 679), and cast doubt on the credibility of Anna's testimony that Hadden licked her vagina while treating her for HPV (A. 558, 560; *see also* A. 584-85, 600-02 (eliciting from expert witness that HPV was transmissible by oral sex to suggest that Hadden would not have licked Anna's vagina)). The evidence of Hadden's pattern of sexual abuse was thus

_____

[7] During summation, the defense stated that it was not asking the jury to infer from this that the abuse did not happen (A. 1028), but throughout the presentation of the evidence, that inference was available to the jury.

25

highly relevant to corroborate the testimony of the statutory victims and respond to the defense's subtle but unmistakable attacks on their credibility.

Hadden argues that the evidence nonetheless should have been excluded as unfairly prejudicial under Rule 403. (Br. 46-50). But Hadden ignores Rule 413's "presumption favoring the admission of propensity evidence in sexual assault cases." *Schaffer*, 851 F.3d at 178. As this Court has recognized, Rule 413 itself reflects Congress's "expect[ation] that convictions within [the Rule's] ambit would normally be admitted and that their prejudicial value would normally not be outweighed by the risk of prejudice." *Davis*, 624 F.3d at 512 (citing *Larson*, 112 F.3d at 604-05 (citing legislative history and affirming district court's admission of evidence of defendant's sexual assault of other victims)). This case is therefore wholly unlike *United States v. McPartland*, 81 F.4th 101, 120-21 (2d Cir. 2023), cited by Hadden (Br. 48), which did not involve evidence admitted under Rule 413, and where numerous witnesses testified about the same other acts. And because the challenged testimony bore directly on a key disputed issue, this case is unlike *United States v. Randy Never Misses a Shot*, 781 F.3d 1017, 1029 (8th Cir. 2015) (Br. 48), where the Eighth Circuit was troubled by (but affirmed nevertheless) six Rule 413 witnesses carrying "little additional probative value."

This is not the rare case where the unfair prejudice of other sexual acts evidence outweighed its probative value. Hadden's own argument that the evidence was merely cumulative and unnecessary cuts against any claim of prejudice. (Br. 47-48). While the Rule 413

26

evidence was disturbing, so was Hadden's horrifying conduct at the core of the charges, and the assaults were fairly alike. *See Schaffer*, 851 F.3d at 183 (agreeing with the district court that the Rule 413 evidence, videos of nonconsensual sexual acts with two minor girls, "was no more inflammatory than the conduct alleged in the indictment"). Hadden's forceful purported dilation check of one uncharged victim (A. 643-44), was similar to his forceful touching of statutory victim Melissa's vagina (A. 622). Hadden's touching of another uncharged victim's buttocks and anus in a bent and standing position (A. 633), had similarities to his touching of Stein's anus in a similar position (A. 710 (Stein), 610-11 (Dr. Eddleman describing this positioning as nonstandard for a female patient)). More fundamentally, none of Hadden's conduct towards the uncharged victims was more egregious than his licking of the vaginas of the statutory victims, including those who were pregnant (A. 622 (Melissa)), or had just had medical procedures (A. 673 (Emily)).

In sum, the District Court was well within its discretion to admit other sexual acts evidence under Rule 413.

## C. Limited Testimony About the Impact of Hadden's Abuse Was Properly Admitted

### 1. Relevant Facts

Prior to trial, Hadden moved to preclude evidence of the subsequent impact of the alleged sexual abuse on Hadden's victims. (A. 371). The Government initially indicated that it did "not plan to elicit testimony as to the long-term effects" of Hadden's abuse, but did

27

"seek to elicit limited testimony about how certain victims felt as a result" of the abuse and as it related to their subsequent actions. (A. 371). Judge Berman denied Hadden's motion and held that the government was permitted to "elicit testimony about the impact of the alleged abuse." (A. 371). The District Court explained that "[s]uch testimony, among other things, does go to the elements of the alleged crimes charged in the indictment and may include feelings or actions alleged victims may or may not have taken and when and/or statements they may have made or not made." (A. 371). Judge Berman cited *United States v. Hendricks*, 921 F.3d 320 (2d Cir. 2019), for the proposition that "impact on a victim is admissible at trial if it is relevant to prove an element of the charged offense and is subject to normal tests of relevancy and unfair prejudice." (A. 371).

During trial, several statutory victims gave limited testimony about certain effects of Hadden's abuse. Kate Evans testified that she felt "extremely anxious, extremely nervous" before her first appointment with a new gynecologist and experienced heart palpitations "with the thought of getting examined again." (A. 536). Melissa Taylor explained that she switched to a female gynecologist and "freaked out" when a male gynecologist treated her in the emergency room, although she told that gynecologist that she had never been sexually abused because she "felt embarrassed." (A. 624). She also testified that she feels "unsure, afraid" going to the gynecologist now. (A. 624). Following cross examination about returning for an appointment after Hadden's supposed abuse, Emily Anderson testified on redirect examination that she did not tell anyone about

28

the abuse at the time because she was "embarrassed and scared" and "didn't think anyone would believe" her. (A. 680). Emily further explained that the abuse had a "major impact" on her life, even ten years later. (A. 680).

Laurie Kanyok, whose testimony was admitted pursuant to Rule 413, was asked during direct examination about how her experiences with Hadden affected her relationship with her ex-boyfriend, to which she answered, "I don't know." (A. 650). Laurie explained that it had "been a long" process to come forward against Hadden but "that it was important that I did what I did because he had to stop practicing medicine" and she would "do anything to protect" her daughter "from going through this kind of thing." (A. 650). Another Rule 413 victim testified that after Hadden's abuse, she and her then-husband were "fighting a lot" and he "didn't believe" that she had been abused. (A. 561).

At the parties' request (Dkt. 233-1 at 66), Judge Berman instructed the jury that testimony about the "long-term impacts of the defendant's sexual abuse of others" was "admitted for limited purposes as potentially bearing upon the credibility of the witnesses," and "may not [be] consider[ed] . . . as a substitute for proof that the defendant committed the crimes charged." (A. 1083).

## 2. Discussion

Hadden argues that victim testimony about the impact of Hadden's abuse was improperly admitted because it was irrelevant and highly prejudicial. (Br. 51).

29

But this limited testimony was probative of the victims' credibility that they had been abused by Hadden. This testimony was generally elicited to explain: (1) the timing of victim decisions to report Hadden's abuse, which was often delayed; (2) why victims returned for medical appointments with Hadden after his abuse; and (3) whether victims changed doctors or avoided appointments with Hadden.

Once again, Hadden claims that "credibility was not at issue." (A. 51). As explained *supra* at 24-25, Hadden did ask questions and make arguments to cast doubts on victim credibility, including about the timing of their disclosures, the decision to receive further treatment from Hadden after being abused, and the sexual nature of Hadden's medical exams. Testimony about being afraid and embarrassed gave the jury context for why these victims may have delayed disclosure, just as testimony about anxiety during subsequent medical appointments belied any insinuation that victims perceived Hadden's medical examinations as normal and nonsexual at the time they were administered. Hadden emphasizes Melissa's testimony that she "freaked out" when she had to see a male gynecologist. (Br. 50). This testimony, however, was in the context of Melissa explaining why, when asked by this doctor if she had been sexually abused by another doctor, she denied being abused—a prior inconsistent statement that bore directly on her credibility.

Quoting *United States v. Whitten*, 610 F.3d 168, 190 (2d Cir. 2010), Hadden argues that victim impact testimony may violate due process if it is "so unduly prejudicial that it renders the trial fundamentally

30

unfair." (Br. 52). But *Whitten* concerned victim impact testimony at the sentencing phase of a death penalty trial (and upheld the admission of such testimony). On the other hand, the District Court correctly relied on *Hendricks*, which held that it was within the district court's discretion to admit testimony from a victim about how the robbery affected her and from the teller victims that they could not return to work after the robbery. *Hendricks*, 921 F.3d at 329-30. Selectively quoting *Hendricks*, Hadden claims that testimony about long-term impact is "minimally probative" and "raises the specter of unfair prejudice." (Br. 52 (quoting *Hendricks*, 921 F.3d at 330)). But the Court in *Hendricks* was commenting on probative value specifically with respect to whether the defendant "acted 'by intimidation' *during* the robbery," *id.* at 329 (emphasis in original), and ultimately concluded that victim testimony about lingering fear and inability to return to work *was* properly admitted under Rules 401 and 403, *id.* at 324, 330. Just as there "testimony regarding how [the victims] felt after the robbery was relevant because the lingering effects of the robbery may tend to show that they were intimidated at the time of the robbery," *id.* at 330, so too here testimony about the effects of the abuse tended to show that the victims were subjected to sexual assault, rather than routine medical examination as Hadden claimed with respect to some of the abuse (A. 1027).[8]

---

[8]  Limited witness testimony about the impact of Hadden's abuse on romantic relationships (A. 561, 650, 686), was also properly admitted because the Government anticipated calling the victims' significant

31

Here, the probative value was also not outweighed by a danger of unfair prejudice. As in *Hendricks*, the testimony was "brief." *Hendricks*, 921 F.3d at 330. In some instances, as when Laurie Kanyok testified that she did not know if Hadden's abuse affected her romantic relationship, it was dry. (A. 650). It was Hadden's horrific conduct itself—the worst of which Hadden did not dispute, such as licking patients' vaginas —that was most likely to "excite emotions" (Br. 51), whereas the little evidence offered of the aftermath of this undisputed conduct (such as stress, anxiety, and strain on personal relationships) was entirely predictable. Moreover, any potential for unfair prejudice was cured by the District Court's limiting instruction to consider the testimony for the "limited purpose[ ] as potentially bearing upon the credibility of the witnesses" and not "as a substitute for proof" of the charged crimes. (A. 1083). Hadden claims that the limiting instruction "did not go far enough" because the District Court "should have clearly instructed the jury not to consider [the testimony] at all in determining guilt" (Br. 53), but that merely rehashes Hadden's failed argument that the evidence had no probative value. This Court "presume[s] that juries understand and abide by a district court's limiting instructions,"

---

others, and testimony about estrangement tended to rebut any claim that those witnesses had a bias to testify falsely.

32

and there is no basis to doubt that here. *United States v. Bermudez*, 529 F.3d 158, 163 (2d Cir. 2008).[9]

### D. Evidence of Reporting Hadden's Assaults Was Properly Admitted

Hadden objects to the testimony of three witnesses, and the admission of one 911 call, that related to reports of abuse from Kate Evans, a statutory victim, and Laurie Kanyok, whose testimony was admitted under Rule 413. Contrary to Hadden's claims on appeal, this testimony was relevant and noncumulative. As explained, Hadden sought to undermine victim credibility at trial. Evidence of contemporaneous disclosures and reporting of abuse belied any suggestion that the victims considered routine exams to be abusive only in hindsight, or that the failure to immediately disclose the abuse or expose Hadden meant that the abuse was not pervasive and systematic. Testimony about Laurie's and Kate's efforts to report Hadden completed the story of how Hadden's pattern of

---

[9] Hadden cites several unusual cases where evidence was deemed unfairly prejudicial despite a limiting instruction, but in those cases—unlike here—the jury was exposed to surprising and highly prejudicial evidence. *See United States v. Jones*, 16 F.3d 487, 493 (2d Cir. 1994) (prior conviction); *United States v. Curley*, 639 F.3d 50, 60 (2d Cir. 2011) (conduct of defendant's brother raising fear of jury attributing guilt to defendant's "clan"); *United States v. Williams*, 585 F.3d 703, 710 (2d Cir. 2009) ("parade of guns and photographs" suggesting association with drug dealers).

33

abuse had persisted until that point. (A. 545 (Kate Evans); *see also* A. 702 (Lozada, medical staff, describing fear of reporting)).

The testimony was also not impermissible hearsay. Dr. Talati, who was Kate's subsequent gynecologist, testified that Kate reported to Dr. Talati that she had "extreme anxiety" with gynecological exams and been assaulted by her previous gynecologist, and Dr. Talati documented this in Kate's medical records. (A. 543-45; GX 308-02A). Hadden argues that this testimony was not properly admitted as a prior consistent statement of Kate's. (Br. 55-56). But the testimony was properly admitted under Rule 803(4) as a statement seeking "medical diagnosis or treatment" that relates to "medical history; past or present symptoms or sensations; their inception; or their general cause." Fed. R. Evid. 803(4). Dr. Talati considered Kate's statement pertinent to her medical treatment. (A. 545). The statement that Kate was experiencing anxiety because she had been "assaulted by her previous gynecologist" (A. 545), certainly related to the "inception" and the "general cause" of her symptoms, Fed. R. Evid. 803(4)(B).

Hadden also argues that the District Court impermissibly permitted Emily Anderson—a statutory victim and friend of Laurie Kanyok—to testify about Laurie's text messages to her after Hadden licked Laurie's vagina. (Br. 56; A. 674). But as Hadden acknowledges, those text messages were properly admitted as Laurie's excited utterances under Federal Rule of Evidence 803(2). (Br. 56). Emily's testimony about the text messages gave the jury relevant context for the text messages and for what happened next: Hadden

34

called Emily, who declined to pick up, and left her a voicemail that something strange had happened with Laurie. (A. 675).

Similarly, the District Court properly admitted a 911 call reporting Hadden's abuse of Laurie as an excited utterance under Federal Rule of Evidence 803(2). (A. 684). Hadden does not dispute that the 911 call related to a recent startling event—namely Laurie's appointment about a half hour earlier when Hadden licked her vagina—but argues that the call was improperly admitted because the call was made by Laurie's boyfriend, rather than by Laurie herself. (Br. 56-57). To be sure, firsthand knowledge bears on the admissibility of an excited utterance. *See, e.g.*, *Brown v. Keane*, 355 F.3d 82, 90 (2d Cir. 2004) ("a witness's report may be admitted only where grounds exist for a finding that the witness has personal knowledge of the matter to which the statement relates"); *United States v. Tocco*, 135 F.3d 116, 128 (2d Cir. 1998). But it is apparent from the recording that Laurie's boyfriend called 911 alongside Laurie and on her behalf, and shortly after picking her up from Hadden's office, which left both of them in a state of distress. *See* GX 52 (Laurie's boyfriend telling the 911 operator that "*we* need to file a report"); (A. 684-85 (describing feelings of anxiety and fear)).

Even if this evidence were erroneously admitted, any error was harmless. Hadden argues that the testimony was "cumulative of evidence that had already been admitted as excited utterances." (Br. 54). At most, then, the testimony corroborated other properly admitted evidence. Hadden claims that on the 911 call,

35

Laurie's boyfriend "recounted the events *as if* he had witnessed them, but he in fact had not." (Br. 57). This mischaracterizes the recording, where Laurie's boyfriend explained that he had picked Laurie up from her appointment. (GX 52). More to the point, Laurie's boyfriend testified at trial, as did Laurie, Emily, and Dr. Talati. He was thus available for cross examination about the limits of his firsthand knowledge and—as Hadden does not contest—permitted to testify about Laurie's excited utterances immediately after her appointment with Hadden, which he then merely recapped for the 911 operator. To the extent Hadden asserts that these incidents of abuse were "conceded" (Br. 55), the admission of additional corroboration could not have contributed to the jury's verdict, especially when this evidence was not an emphasis of the Government's summation.

### E. The District Court Did Not Improperly Admit Expert Testimony About Delayed Disclosure

Hadden also objects to the District Court's determination that a Government expert witness was permitted to testify about the delayed disclosure of abuse. (Br. 58). To be sure, the Government initially sought to introduce expert testimony from Dr. Rocchio about (1) the doctor-patient relationship and its impact on patients in cases of abuse; and (2) delayed disclosure of abuse. (Dkt. 222-1 at 2). But despite Judge Berman's ruling that testimony on both topics was admissible (A. 522, 688), the Government ultimately inquired of Dr. Rocchio only about the first subject in its expert notice, and never asked Dr. Rocchio to define "delayed

36

disclosure" or explain why or how often it occurs in cases of sexual assault. (A. 693-99).

Notably, while Hadden criticizes the District Court's reasoning, he does not identify any objectionable testimony from Dr. Rocchio in his argument. (Br. 58-59). At most, in his recitation of the trial evidence, Hadden refers to Dr. Rocchio's testimony that "many victims do not label their abuse as such," that victims may not recognize they were assaulted, and that victims may deny or minimize their abuse to themselves and to others. (Br. 21-22). But this testimony was offered in the context of Dr. Rocchio explaining the doctor-patient power differential and how it can be abused to maintain contact with a victim and facilitate ongoing abuse, *i.e.*, to enable inducement. Dr. Rocchio never opined about common patterns of delayed disclosure in abuse victims, or the subjects of self-blame, shame, memory, and trauma, as had been originally proposed on this topic. (*See* Dkt. 221-2 at 2). The relevance of this testimony was instead to explain how the relationship of trust between a doctor and a patient can be exploited and result in inducement, the key disputed element at trial. Any error in Judge Berman's ruling—even if there were one—was thus plainly harmless and "did not contribute to the verdict." *Neder*, 527 U.S. at 15.

Even if "delayed disclosure" testimony had been elicited, Judge Berman was well within his discretion in determining that it was admissible. (A. 688). Despite his assertions otherwise, Hadden cast doubt on victim credibility beginning with his opening statement, which highlighted the victims' civil lawsuits. By

37

the time of Dr. Rocchio's testimony, Hadden had questioned Melissa and Emily for returning to see Hadden after being abused (A. 626-27, 676-77) and indicated that he would impeach one of the nurses for referring a friend to Hadden after witnessing him sexually assault a patient (A. 603). There was thus ample basis to admit Dr. Rocchio's testimony on delayed disclosure to illuminate for the jury why the victims—even if abused—delayed reporting and continued to be treated by Hadden. *See, e.g.*, *United States v. Johnson*, 860 F.3d 1133, 1140 (8th Cir. 2017) ("[E]xpert testimony about how individuals generally react to sexual abuse—such as not reporting the abuse and not attempt to escape from the abuser—helps jurors evaluate the alleged victim's behavior.").

## F.   Any Errors Were Harmless

Even if the District Court erred in any of the evidentiary rulings challenged on appeal—which it did not—any error was harmless based on the overwhelming evidence of Hadden's guilt. Hadden repeatedly intones that the errors were harmful and prejudicial. But to the extent the Court accepts Hadden's claims that Hadden's sexual abuse and victim credibility were entirely conceded points, then any evidentiary error in admitting additional evidence of Hadden's abuse or of witness credibility was harmless.

Moreover, the evidence of Hadden's guilt was overwhelming. Even setting aside the properly admitted testimony of the five additional victims under Rule 413, four statutory victims testified against Hadden and their testimony of his sexual assaults during

38

medical exams was corroborative of one another and corroborated by documentary evidence. Hadden's state guilty plea—the admission of which Hadden does not challenge on appeal—further corroborated his pattern of abuse.

With respect to Hadden's "technical" defense about the timing of inducement (Br. 1), the evidence overwhelmingly showed that Hadden induced his victims to travel interstate with the intent to sexually abuse them at future appointments. Among other things:

- Each statutory victim testified that Hadden told them when to return for appointments, thus inducing them to travel. (A. 530, 541 (Kate), 620 (Melissa), 655-56, 663 (Emily), 709 (Sara)).

- The Government introduced testimony and documents establishing that Hadden was aware that each statutory victim traveled interstate to Manhattan. (A. 530 & GX 308-1E (Kate); A. 619 & GX 307-1A, 307-1F (Melissa); A. 657 & GX 11, 13, 409, 411, 414, 416 (Emily); A. 708, 718 (Sara)).

- Each of the statutory victims described at least one incident in which Hadden, at the end of an appointment during which he sexually abused her, directed the victim to return for more abuse (A. 533-34 (Kate), 622-23 (Melissa),655, 657-58 (Emily), 709-10 (Sara)).

39

Hadden made forceful arguments to the jury that the Government failed to prove inducement, but the jury rejected them in light of the overwhelming proof of guilt. (*See* A. 1021-27 (arguing failure to prove defendant's conduct amounted to inducement), 1027-28 (arguing failure to prove defendant's knowledge of interstate travel), 1028 (arguing failure to prove defendant's intent to abuse existed at time of inducement)). There is no reasonable possibility that any of the errors Hadden complains of, singly or in combination, affected the verdict. *See, e.g.*, *McPartland*, 81 F.4th at 121 (erroneous admission of cumulative evidence was harmless "in light of the myriad other evidence presented at trial"); *see also United States v. Ramirez*, 609 F.3d 495, 501 (2d Cir. 2010) ("We have frequently stated that the strength of the government's case is the most critical factor in assessing whether error was harmless.").

## POINT III

### The District Court's Sentence Was Procedurally Reasonable

Hadden asserts that the District Court committed numerous procedural errors. (Br. 59). Not so. The District Court provided the parties with ample time to submit numerous sentencing submissions, carefully reviewed those submissions, and conducted a thorough sentencing proceeding over the course of three days. At sentencing, the District Court previewed its proposed sentence for the parties, afforded Hadden's counsel and Hadden repeated opportunities to be heard before imposing sentence, discussed the trial record and

40

Section 3553(a) factors at length, and declined to consider victim impact statements in determining the appropriate sentence. The District Court correctly calculated the Guidelines range, and indicated that regardless of the Guidelines range, it would impose the same sentence.

## A.  Relevant Facts

### 1.  The Parties' Sentencing Submissions

Prior to sentencing, Hadden filed numerous written submissions, advocating for a sentence of 36 months' imprisonment in light of Hadden's upbringing, mental health treatment, alleged acceptance of responsibility, prior sentence (*i.e.*, loss of a medical license), the care needed by his son and wife, and the potential for abuse while incarcerated. (Dkts. 295, 299, 304, 309, 310, 315, 316, 318).

The Government also filed numerous submissions, seeking an above-Guidelines sentence of 25 years' imprisonment based on the frequency and duration of Hadden's sexual abuse and assaults (Hadden committed at least 167 to 310 acts of sexual abuse or assault on at least dozens of patients), including against vulnerable patients, Hadden's abuse of his position of trust, his history of deception, his risk of recidivism, and his failure to accept responsibility. (Dkts. 296, 298, 300-01, 306-08, 312, 317).

Prior to sentencing, the Probation Office calculated a Guidelines range based on an offense level of 24 and a criminal history category of I (A. 1690), which both the Government and Hadden contested (A. 1193-205,

41

1690), and which Judge Berman ultimately adopted. The Probation Office recommended an upward variance and departure, and a sentence of 15 years' imprisonment. (A. 1690).

## 2. The Three-Day Sentencing

The sentencing took place over the course of three days in June and July 2023.

*Day 1*. On June 28, 2023, the District Court presided over the first phase of Hadden's sentencing, and afforded victims the opportunity to be heard. (A. 1665-79). Eleven victims spoke at sentencing and 37 victims submitted written victim impact statements, in addition to written and oral victim statements submitted in support of Hadden's post-conviction remand.

*Day 2*. On July 24, 2023, the District Court began the second phase of Hadden's sentencing. Judge Berman carefully discussed the trial record and opined that the case was "one of a kind" in the severity and extent of Hadden's criminal conduct. (A. 1681-87). Judge Berman repeatedly made clear that in determining the appropriate sentence, he was not relying on any victim impact statements. (A. 1692-93; *see also* A. 1681 ("[M]y goal is to achieve a fair and reasonable sentence firmly grounded in the 3553(a) factors and the trial record."), 1701 ("What I did say, I thought crystal clear, was that the sentence that I propose is the same sentence, is the maximum sentence, whether or not there were victim statements, if you listened, you know, so it would not impact . . . I think the actual trial record requires a maximum sentence."), 1721 (same)). The District Court provided a "preview" to the

42

parties of his proposed sentence of twenty years' imprisonment. (*See* A. 1690 ("proposing" sentence), 1692 ("proposed a variance" and "proposing to be part of the sentence"); 1697, 1699-1701, 1721 (same); 1725 (discussing sentence the court "intend[ed] to impose"); 1721, 1723-24 ("previewing the sentence" before imposing it)).

Consistent with the Probation Office's Guidelines calculation, the District Court concluded that Hadden's total offense level was 24. (A. 1688-90). Judge Berman applied a four-point enhancement under U.S.S.G. § 3A1.1(b)(1)-(2), concluding that, based on the trial testimony, Hadden had sexually abused more than ten victims who were vulnerable because they were pregnant, had complicated medical issues, and/or were long-time victims of Hadden. (A. 1690-91).

The District Court thoroughly discussed each of the § 3553(a) factors. (A. 1680-1701). Judge Berman advised that he believed that the arguments of Hadden's counsel relating to mitigation were "outweighed" by the Section 3553(a) factors (A. 1699; *see* A. 1694), and that the "nature and circumstances factors overwhelmingly ... support an upward variance to 20 years of incarceration." (A. 1694). Relying on the trial record and the undisputed facts contained in the Presentence Report, the District Court found, among other things, that Hadden sexually abused and assaulted at least approximately 40 patients (A. 1693); Hadden's four crimes of conviction were "extraordinary" and "depraved" (A. 1691-92); and the duration and severity of Hadden's crimes, the number of victims, his abuse of trust, and sophisticated techniques,

43

among other factors, made his offenses "unprecedented" (A. 1693-94).

Judge Berman also emphasized that Hadden's deceptiveness supported a 20-year sentence. He noted that Hadden's psychotherapist of 20 years reported that "Hadden did not disclose any sexual paraphilia, despite the fact that she was apparently treating him while he was abusing his patients" (A. 1695), whereas the defense psychosexual evaluation "recently revealed ... for the first time ... that Hadden has longstanding deviant sexual interests." (A. 1695).

As to the remaining Section 3553(a) factors, Judge Berman considered the "unprecedented and shocking" nature of Hadden's conduct as meriting a 20-year sentence to reflect the "seriousness of the offense," "promote respect for the law," and "provide just punishment," 18 U.S.C. § 3553(a)(2)(A). (A. 1696-98, 1726). Judge Berman also noted that such a sentence would provide specific and general deterrence and protect the public from further crimes by Hadden, who presented a risk of recidivism. (A. 1698-99). Judge Berman additionally considered the kinds of sentences available, the Guidelines range, pertinent policy statements, the need to avoid unwarranted sentence disparities, and victim restitution. (A. 1699-700).

Prior to the imposition of sentence the following day, Judge Berman heard from Hadden's counsel (A. 1701-07, 1712-16), and actively considered and engaged with Hadden's arguments (*see, e.g.*, A. 1703-04 (asking Hadden's counsel questions about therapy and potential for recidivism), 1705 (disagreeing with Hadden's counsel about Hadden's history of deception),

44

1706 (disagreeing with Hadden's argument that the court was treating this case differently than others), 1706 (discussing Hadden's ability to pay a fine), 1707 (discussing potential facilities for Hadden)).

Judge Berman also provided Hadden the opportunity to be heard—which he declined. (A. 1717).

*Day 3.* The District Court continued sentencing proceedings on July 25, 2024, in light of Hadden's request for specific rulings regarding objections to the Presentence Report and victim impact statements. (A. 1720-21).

Judge Berman gave Hadden's counsel additional opportunities to be heard. (A. 1722 (argument on mitigating factors), 1723-24 (argument on testimony of Hadden's medical staff), A. 1726-27 (argument regarding conditions of supervised release)). He also afforded Hadden a second opportunity to be heard, at which time Hadden stated: "I just want to say that I am very sorry for all the pain I have caused. Thank you." (A. 1722). Judge Berman then previewed the sentence of twenty years' imprisonment that he planned to impose (A. 1725-26), gave Hadden's counsel an additional opportunity to be heard (A. 1726-27), and gave Hadden an additional opportunity to be heard, which he declined (A. 1727).

The District Court then sentenced Hadden principally to 20 years' imprisonment, followed by lifetime supervised release. (A. 1727).

45

## B. Procedural Reasonableness

This Court reviews a sentence for procedural reasonableness under a "deferential abuse-of-discretion standard." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc). "Procedural error occurs in situations where, for instance, the district court miscalculates the Guidelines; treats them as mandatory; does not adequately explain the sentence imposed; does not properly consider the § 3553(a) factors; bases its sentence on clearly erroneous facts; or deviates from the Guidelines without explanation." *United States v. McIntosh*, 753 F.3d 388, 394 (2d Cir. 2014).

This Court reviews a district court's legal application of the United States Sentencing Guidelines *de novo*, but reviews findings of fact for clear error. *United States v. Rubenstein*, 403 F.3d 93, 99 (2d Cir. 2005). A district court's factual finding at sentencing is clearly erroneous only when "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573 (1985).

"Even in the case of significant procedural errors, [this Court] will not vacate a sentence and remand if the record indicates clearly that the district court would have imposed the same sentence in any event." *United States v. Rasheed*, 981 F.3d 187, 197 (2d Cir. 2020).

46

### C. The Sentencing Proceeding Complied with Federal Rule of Criminal Procedure 32

Hadden's claim that he was denied the right to be heard before the District Court about the appropriate sentence is meritless. (Br. 61). Hadden was afforded multiple opportunities to speak before Judge Berman decided and imposed Hadden's sentence.

#### 1. Rule 32

Rule 32 requires the District Court, "[b]efore imposing sentence," to "provide the defendant's attorney an opportunity to speak on the defendant's behalf" and to "address the defendant personally in order to permit the defendant to speak or present any information to mitigate the sentence." Fed. R. Crim. P. 32(i)(4)(A)(i)-(iii); *see also United States v. Gates*, 84 F.4th 496, 502 (2d Cir. 2023) (citing cases). Rule 32 "does not—and could not—mean that the district court must refrain from formulating thoughts about the appropriate sentence until after the defendant and her lawyer have addressed the court." *Id.* Instead, Rule 32 "simply means that a judge must hear from the defendant and her counsel before reaching a final decision and imposing sentence." *Id.*

#### 2. Discussion

Contrary to Hadden's claim on appeal, Judge Berman gave Hadden three opportunities to speak (A. 1717 (defendant declined); A. 1722 (defendant spoke); A. 1727 (defendant declined)), and Hadden's counsel numerous opportunities to be heard (A. 1701-

47

07, 1712-16, 1722-24, 1726-27), all before imposing sentence.

Hadden argues that the District Court had improperly predetermined Hadden's sentence before hearing from Hadden and his counsel. The record, however, makes clear that it was not until the third day—after giving Hadden and his counsel multiple opportunities to be heard—that the District Court imposed its sentence. (A. 1727). This case is therefore unlike *United States v. Gonzalez*, 529 F.3d 94 (2d Cir. 2008), on which Hadden relies. (Br. 63-64). In *Gonzalez*, the district court called the parties back to the courtroom *after* the sentence had already been imposed to give the defendant a chance to speak and did not state any reasons for adhering to the previously-imposed sentence. *Id.* at 97.

Here, by contrast, prior to Hadden's statement to the District Court, the District Court had previewed its analysis and discussed a proposed or anticipated sentence (*see, e.g.*, A. 1690 ("proposing" sentence), 1692 (same); 1697, 1699, 1700, 1701, 1721 (same); 1725 (discussing sentence the court "intend[ed] to impose"); 1721, 1723-24 ("previewing the sentence" before imposing it)), but had not imposed sentence, as even Hadden's counsel recognized. (A. 1717 ("I think we need to see that *before you impose sentence*." (emphasis added))). It was appropriate for Judge Berman to offer the parties the benefit of his reaction to the trial evidence and the parties' sentencing submissions so that the parties could address the District Court's concerns and advocate for a different sentence. As this Court recently explained in *Gates*, the district court may "formulat[e] thoughts about the appropriate

48

sentence" before the parties have addressed the court, but "must hear from the defendant and her counsel before reaching a final decision and imposing sentence." *Gates*, 84 F.4th at 502. That is what happened here, and the District Court thus did not "lack[ ] access to . . . information" about "the defendant's attitude towards his commission of the crime." (Br. 64 (quoting *United States v. Lajeunesse*, 85 F.4th 679, 694 (2d Cir. 2023)).[10]

Any error was also harmless. Hadden initially declined to speak at all, and when he later did, it was a one-sentence statement that he was "very sorry for all the pain I have caused." (A. 1722). Given the record of Hadden's egregious conduct, this glib apology fell short of true acceptance of responsibility, and it is implausible that had Hadden offered this terse, general

---

[10] Even where, unlike here, the District Court announces its final sentence, and only then provides a defendant the opportunity to speak, this Court has held there is no Rule 32 violation as long as the judge gives the defendant's statement "full consideration" and "respond[s] by giving reasons for his decision to adhere to the previously announced sentence." *United States v. Margiotti*, 85 F.3d 100, 103 (2d Cir. 1996) (favorably citing *United States v. Laverne,* 963 F.2d 235, 237-38 (9th Cir.1992), for its holding that there is no Rule 32 violation where the defendant had an opportunity to speak "before the court made its final judgment but after it had made a preliminary determination regarding defendant's sentence, and gave full consideration to defendant's statement").

49

statement earlier, he would have received a different sentence.

## D. The District Court Correctly Calculated the Guidelines Range

Contrary to Hadden's claims (Br. 65-70), the District Court correctly calculated Hadden's Guidelines range and, in any event, would have imposed the same sentence regardless of the Guidelines calculation.

### 1. The District Court Properly Considered Hadden's Uncharged Sexual Abuse of Female Patients as Relevant Conduct

#### a. Relevant Conduct

Under the Sentencing Guidelines, relevant conduct includes "[c]onduct that is not formally charged or is not an element of the offense of conviction," all of which "may enter into the determination of the applicable guideline sentencing range." U.S.S.G. § 1B1.3, Background.

Relevant conduct includes the following, among other things:

> [A]ll acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant ... that occurred during the commission of the offense of conviction, in *preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense* .... [and]

50

> [A]ll harm that resulted from the acts
> and omissions specified in subsections
> (a)(1) and (a)(2) above, and all harm that
> was the object of such acts and omissions.

U.S.S.G. §§ 1B1.3(a)(1)(A), 1B1.3(a)(3) (emphasis
added); *see also United States v. Wernick*, 691 F.3d
108, 115 (2d Cir. 2012) (discussing *United States v.
Ahders*, 622 F.3d 115, 122 (2d Cir. 2010)). Conduct is
relevant under the Guidelines where there is "proof of
a *connection* between the acts" beyond the "bare fact of
temporal overlap." *Wernick*, 691 F.3d at 115 (emphasis
in original).

### b.    Discussion

The District Court properly concluded that Hadden's sexual abuse of non-statutory victims presented
at trial constituted relevant conduct under the Guidelines. (A. 1684). Hadden claims that the uncharged
abuse did not constitute relevant conduct under
U.S.S.G. § 1B1.3(a)(2). (Br. 65). But he overlooks that
the uncharged abuse was plainly relevant conduct under U.S.S.G. § 1B1.3(a)(1)(A).[11] Hadden's sexual abuse
of non-statutory victims (a) was "caused by the defendant," and (b) "occurred during the commission of the

---

[11] Although Judge Berman at sentencing referenced Note 5(b)(ii) (A. 1684), which pertains to Section
1B1.3(a)(2), the Government relied in its sentencing
submission on Section 1B1.3(a)(1)(A) (Dkt. 296 at 40-
45), and this Court may affirm "on any grounds supported in the record." *United States v. Cramer*, 777
F.3d 597, 603 (2d Cir. 2015).

51

offense[s] of conviction," "in preparation for those of-
fenses," and "in the course of attempting to avoid de-
tection or responsibility for those offenses." U.S.S.G.
§ 1B1.3(a)(1)(A). As Judge Berman noted, "the same
type of abuse was suffered by the women patients" and
the abuse was "closely related as part of the same
course of abusive conduct because they were all part of
a single episode, spree, or outgoing series of offenses."
(A. 1684).

This conclusion was supported by the record, which
showed that for decades, Hadden developed and used
the same means and methods on non-statutory victims
that he used to abuse the statutory victims. (PSR
¶¶ 13-19). Through each victim that he sexually
abused or attempted to sexually abuse, Hadden honed
his *modus operandi* and tactics, including his exploita-
tion of the doctor-patient relationship of trust and the
rapport he had built with patients, his methods to iso-
late patients and conceal his abuse, his concealment of
abuse as legitimate medical care, and his guise of con-
ducting second fake exams, among other things. As a
result, Hadden's years of abusing patients under the
auspices of medical care was both during, and consti-
tuted essential preparation for, his abuse of the four
statutory victims in this case.

This case resembles *Ahders*, where this Court af-
firmed that exploitation of other minors, during com-
mission of the offense of conviction, was relevant con-
duct. *Ahders*, 622 F.3d at 119. In *Ahders*, the defend-
ant sexually abused his stepson and recorded the
abuse; he also molested two other children and rec-
orded those acts. *Id.* at 117. This Court explained that

52

the defendant's abuse of the non-statutory victims occurred "during the commission of the offense of conviction" because "it occurred during the period that Ahders was producing pornographic images and film" of the statutory victim. *Id.* at 120. "The non-charged conduct thus occurred 'during' the charged conduct under § 1B1.3 not simply because of its temporal overlap, but because it was closely related as part of the same course of abusive conduct and occurred at the same time." *Wernick*, 691 F.3d at 116 (describing *Ahders*). So too here. *See also United States v. Carter*, 960 F.3d 1007, 1012 (8th Cir. 2020) (promoting commercial sex acts with uncharged victims held to be relevant conduct under U.S.S.G. § 2G1.1, because it occurred "during the commission of the offense of conviction," a charged sex trafficking and prostitution scheme).

Accordingly, the District Court properly considered the uncharged sexual abuse of other female patients as relevant conduct.

## 2. The Guidelines Enhancement for a Large Number of Vulnerable Victims Applied

### a. Vulnerable Victims Enhancement

Under U.S.S.G. § 3A1.1(b)(1), if the defendant "knew or should have known that a victim of the offense was a vulnerable victim," a two-level increase is warranted. U.S.S.G. § 3A1.1(b)(1). A "vulnerable victim" means a person "(A) who is a victim of the offense of conviction and any conduct for which the defendant is accountable under § 1B1.3 (Relevant Conduct); and (B) who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly

53

susceptible to the criminal conduct." U.S.S.G. § 3A1.1, App. Note 2. Courts have interpreted "'susceptible to criminal conduct' as emphasizing that a particular victim was less likely to thwart the crime, rather than more likely to suffer harm if the crime is successful." *United States v. McCall*, 174 F.3d 47, 49-50 (2d Cir. 1998) (citing, *e.g.*, *United States v. O'Neil*, 118 F.3d 65, 75 (2d Cir. 1997) ("[F]ocus not on the likelihood or extent of harm to the individual if the crime is successful, but on the extent of the individual's ability to protect himself from the crime.")).

For the enhancement to apply, (1) "the vulnerability of the victim must bear some nexus to the criminal conduct"; (2) "the defendant must have singled out the vulnerable victims from a larger class of potential victims" but need not have "select[ed] the victim because of his or her vulnerability"; and (3) "broad generalizations about victims based upon their membership in a class are disfavored where a very substantial portion of the class is not in fact particularly vulnerable to the crime," leading courts in such cases to require "that the enhancement be based on individualized findings as to the vulnerability of particular victims," although "many cases have upheld vulnerable victim enhancements based on group generalizations." *McCall*, 174 F.3d at 50-51.

An additional two-level increase is warranted under U.S.S.G. § 3A1.1(b)(2) where the offense "involved a large number of vulnerable victims." The term is not defined in the Guidelines, but ten victims has been held to constitute a "large number." *See, e.g.*, *United States v. Williams*, 547 F. App'x 251, 255 (4th Cir.

54

2013) (summary order) (applying enhancement where there were more than 10 victims); *United States v. Kaufman*, 546 F.3d 1242, 1269 (10th Cir. 2008) (holding that "ten victims is a large number" in involuntary servitude case).

**b.    Discussion**

The District Court correctly applied a four-level enhancement because Hadden abused a large number of vulnerable victims. *See* U.S.S.G. § 3A1.1(b)(1) (two-level increase for vulnerable victims), (b)(2) (additional two-level increase for a large number of vulnerable victims). Hadden claims the District Court relied on "vague" evidence and "nothing other than speculation." (Br. 70). But among other things, the District Court properly relied on the testimony of Lozada, a member of Hadden's medical staff, who had observed Hadden conduct five to seven abusive vaginal examinations of pregnant patients per year for six years. (A. 1693). The conclusion that Hadden had therefore abused at least 30 pregnant patients was thus a "reasonable inference[ ]" from the evidence, not speculation as Hadden claims. *United States v. Gaskin*, 364 F.3d 438, 464 (2d Cir. 2004).

The vulnerabilities of Hadden's victims clearly bore a "nexus" to the criminal conduct because these very vulnerabilities enabled Hadden to carry out his sexual abuse. *McCall*, 174 F.3d at 50. As the District Court found, Hadden abused dozens of victims who were pregnant, including Sara, Melissa, Gabriela, Laurie, and the dozens of pregnant women he abused in the labor and delivery room in the 1990s. As a result of

55

their pregnancies and complicated conditions, pregnant victims had more frequent appointments with Hadden, relied on Hadden significantly more than non-pregnant patients, experienced significant physical changes, including profound changes to their bodies and a lack of visibility over their stomachs during exams, and were focused and concerned about the health and welfare of their unborn babies. (*See, e.g.*, A. 620 (Melissa), A. 636 (Laurie)). *See, e.g.*, *United States v. Cline*, 986 F.3d 873, 880 (5th Cir. 2021) (affirming enhancement where victim was pregnant); *United States v. James*, 139 F.3d 709, 714 (9th Cir. 1998) (same).

Moreover, although the pregnant victims alone justify the enhancement, Hadden also abused victims who were vulnerable because of factors such as their limited prior experience with OB/GYNs (PSR ¶¶ 20, 25 (Sara and Emily)), their serious medical conditions (*see, e.g.*, A. 655 (Emily)), the relationship Hadden had forged with victims (A. 534 (Kate), 709 (Sara)), and the fact that he had previously abused victims without consequence. *See, e.g.*, *United States v. Fareri*, 712 F.3d 593, 595 (D.C. Cir. 2013) (victims were inexperienced investors, making them "particularly susceptible" to the defendant's fraud).

### 3. Any Error in the Guidelines Calculation was Harmless

The record shows that the District Court would have imposed the same sentence, based on Hadden's extraordinarily severe conduct, regardless of the Guidelines calculation. The District Court agreed with

56

the Government's position that "regardless of the offense level calculated . . . the defendant's conduct as proven at trial is not adequately captured in the guidelines." (A. 1693). In declining to apply an enhancement for fraud, the District Court noted, "It's somewhat—I don't know about irrelevant, but I have proposed a variance which I believe is fully supported by the facts of the case." (A. 1692). The District Court also repeatedly explained that Hadden's conduct "is unquestionably outside the heartland of the sentencing guidelines range and will be treated as such." (A. 1687). Accordingly, even if the District Court incorrectly calculated the Guidelines range, any error was harmless and the sentence should be affirmed. *Rasheed*, 981 F.3d at 197.

### E. The District Court Did Not Improperly Consider Victim Impact Statements

Hadden incorrectly claims that the District Court improperly considered victim impact statements in imposing sentence because the "trial record . . . simply could not support" the 20-year sentence that was imposed. (Br. 71). This claim is expressly contradicted by the record. The District Court made clear multiple times during sentencing that it was not relying on any victim impact statements or any acts of abuse committed by Hadden outside of the trial record. (*See, e.g.*, A. 1693, 1701, 1721).

Hadden's claim rests on the mistaken premise that the trial record itself could not support the sentence imposed. (Br. 71). This, however, is not a question of procedural error, but a meritless challenge to the substantive reasonableness of Hadden's sentence. Hadden

57

cannot carry the "heavy burden" of a substantive reasonableness challenge because his 20-year sentence for sexually abusing dozens of women over decades as a doctor is neither "shocking" nor "unsupportable as a matter of law." *United States v. Broxmeyer*, 699 F.3d 265, 289 (2d Cir. 2012). This Court's review for substantive reasonableness, moreover, is "particularly deferential," *id.*, taking "into account the totality of the circumstances, giving due deference to the sentencing judge's exercise of discretion," *Cavera*, 550 F.3d at 190, and Judge Berman's "sense of what is a fair and just sentence under all the circumstances," *United States v. Jones*, 460 F.3d 191, 195 (2d Cir. 2006).

Hadden's lone citation to *United States v. Akparanta*, No. 19 Cr. 363 (LGS) (S.D.N.Y.) (Br. 75), where a correctional officer received a 40-month sentence for sexually abusing at least seven female prisoners in his care, is unpersuasive. The defendant there pled guilty and accepted responsibility for his crimes, which also differed in scope and duration from Hadden's long-running sexual abuse. Further, as the District Court and the Government noted at sentencing, Hadden's sentence is comparable to those who committed serious sex crimes. (*See* A. 1698, 1700, 1709 (discussing cases)).

## F. The District Court Properly Considered Hadden's Mitigation Arguments

Hadden's claim that the District Court erred in declining to verbally address each of his arguments for a downward departure and variance is unsupported by the law and the record.

58

It is well-established that "this Court presumes that the sentencing judge has considered all relevant § 3553(a) factors and arguments unless the record suggests otherwise." *United States v. Rosa*, 957 F.3d 113, 118 (2d Cir. 2020) (citing cases). This Court "cannot 'assume a failure of consideration simply because a district court fail[ed] to . . . discuss' a given factor." *United States v. Halvon*, 26 F.4th 566, 571 (2d Cir. 2022) (per curiam) (quoting *United States v. Verkhoglyad*, 516 F.3d 122, 131 (2d Cir. 2008)). Similarly, where a Court is aware of its discretion to depart and decides not to, "it is of no significance that the court never explicitly stated that it was denying the [defendant's departure] motion." *United States v. Osorio*, 17 F. App'x 52, 54 (2d Cir. 2001) (summary order) (citing *United States v. Lainez-Leiva,* 129 F.3d 89, 93 (2d Cir. 1997)).

Here, the District Court carefully explained each of the factors set forth in § 3553(a) (A. 1681, 1694-1700), and stated that he had fully and carefully considered "the parties' voluminous written submissions" (A. 1692), including Hadden's arguments as to mitigation, such as his age, his help to his family, and his apparent abstinence from sexual offenses within the last ten years (A. 1694-96). The District Court also made clear it was aware of its authority to depart by indicating it was considering an upward departure (A. 51-52), and ultimately did not depart upward or downward. Notably, Judge Berman pointed out that although the defense objections would "not necessarily be ruled upon as I cite them," his rulings would be implicit "by virtue of the things that I have to say about

59

the case." (A. 1680). It is therefore apparent that the District Court considered each of Hadden's arguments.

Ultimately, Hadden's claim boils down to a disagreement with the weight Judge Berman afforded his mitigation arguments, but the "particular weight to be afforded aggravating and mitigating factors is a matter firmly committed to the discretion of the sentencing judge." *Broxmeyer*, 699 F.3d at 289. After presiding over Hadden's trial, conducting a thorough three-day sentencing hearing, and weighing the various Section 3553(a) factors, the District Court was well within its discretion in concluding that a 20-year sentence was warranted for Hadden's long-running and heinous sexual abuse of female patients in his care.

60

## CONCLUSION

**The judgment of conviction should be affirmed.**

Dated:     New York, New York
           February 26, 2024

                         Respectfully submitted,

                         DAMIAN WILLIAMS,
                         *United States Attorney for the*
                         *Southern District of New York,*
                         *Attorney for the United States*
                              *of America.*

JANE KIM,
PAUL M. MONTELEONI,
LARA POMERANTZ,
DANIELLE R. SASSOON,
    *Assistant United States Attorneys,*
              *Of Counsel.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned counsel hereby certifies that this brief complies with the type-volume limitation of the Federal Rules of Appellate Procedure and this Court's Local Rules. As measured by the word processing system used to prepare this brief, there are 13,940 words in this brief.

DAMIAN WILLIAMS,
*United States Attorney for the*
*Southern District of New York*

By: DANIELLE R. SASSOON,
*Assistant United States Attorney*